Peter H. Bonis (SBN 122016)
LAW OFFICES OF PETER H. BONIS
1990 N. California Street Eighth Floor
Walnut Creek CA 94596
Telephone: (925)287-6428
Facsimile:  (925) 287-6429
Email: Peter@Bonislaw.com

*Attorneys for Petitioning Creditors*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re:<br><br>  WILLIAM F. GARLOCK<br>  Debtor.<br><br>_____ | Case No.: 12-30802<br>Chapter 7 |
| ELLA THOMAS, AN INDIVIDUAL; DAN BRUNE, AN INDIVIDUAL; BRUNE OROVILLE TIC, A CALIFORNIA LIMITED LIABILITY COMPANY; JAMES AND BARBARA NILES, INDIVIDUALS; NILES ENTERPRISES LLC SERIES 1 A DELAWARE LIMITED LIABILITY COMPANY.  BAT AMI GORDON, AN INDIVIDUAL; MARY KAY PARKS, AN INDIVIDUAL AND AS TRUSTEE OF THE MARY KAY PARKS TRUST, ; S. CLAUDIA M. CECILLON; AN INDIVIDUAL AND AS TRUSTEE OF THE CECILLON FAMILY TRUST;  DOUGLAS A. SMITH an individual, HARVEY BILLIG III and MELANIE BILLIG, individuals,  NORMAN and EDITH VAN WOERKOM, individuals, JOAN OLMSTEAD | Adversary Proceeding  No. 13-03174<br><br>**FIRST AMENDED COMPLAINT FOR NONDISCHARGEABIILTY OF DEBTS** |

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 1 of 58

an individual SHIRLEY NASON GREENWOOD, an individual, FRANK ANGELO ALIOTO AND ROSEMARY ALIOTO as Trustees of the ALIOTO FAMILY TRUST;; JOHN H. WARREN and SANDRA A. WARREN, Trustees of the WARREN FAMILY TRUST; TINA MURCHISON, Successor Trustee of the ROBERT R. AVIS TRUST; SUMNER & SURFSIDE LLC, a Nevada limited liability company; GEORGE M. BERBERICH, an individual; RYOJI SAKAUE, an individual; KIYOKO SAKAUE, an individual; LIGHTSPRINGS HOLDINGS LLC, a California limited liability company, LESLIE MATHEWS, an individual; PETER MATHEWS, an individual; LESLIE MATHEWS and PETER MATHEWS as trustees of the PETER GREENE MATHEWS AND LESLIE ANN DAVIS MATHEWS REVOCABLE INTER VIVOS TRUST, a trust; LESLIE MATHEWS and PETER MATHEWS as trustees of the JEFFREY ROBERT MATHEWS IRREVOCABLE TRUST, a trust; LESLIE MATHEWS and PETER MATHEWS as trustees of the RYAN DAVIS MATHEWS IRREVOCABLE TRUST, a trust, RONALD CONKLIN, an individual; ROBERT CONKLIN, an individual; JOELLE CALTON an individual, CLAUDIA ESQUIVEL an individual, DAN BRUNE an individual, and GARY CECCATO an individual; JOAN KENT, an individual; CLARK HUTCHINGS, an individual; KARL KREIDT, an individual, LISA FARIA, an individual, GLOBAL VENTURE CAPITAL GROUP,LLC, a limited liability corporation; JOHN COMYNS and TERESA COMYNS; individuals; LEONARD SKLAR an individual; MYLENE ANSARI, an individual, RICHARD HARRINGTON, an individual; WAG HOTELS, a California Corporation, ALBERT PLUTE, an individual JINA FARZIMPOUR, an individual; JOHANNES WANG, an individual, MONICA HUJAZI an individual; ROBERT FOPPOLI an individual; MARK STUHLKEN as the trustee for the STUHLKEN FAMILY TRUST; GREG

and JEANNIE MACDOUGAL, individuals:
ERICA STANLEY, CONSERVATOR FOR
THE PERSON AND ESTATE OF ROBERT
LOUIS STANLEY, an individual;

PLAINTIFFS,
VS.

WILLIAM F. GARLOCK, AN INDIVIDUAL;
ROSEMARY GARLOCK, AN INDIVIDUAL.
Defendants.

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

### I.  INTRODUCTION

This is an adversary proceeding to determine dischargeability of debts pursuant 11. U.S.C.

Section 523 (a) (2)(A),(4) and (6).  The amount of the debts owed to the plaintiffs in this action

exceeds $30,000,000.  Defendant incurred these judgments by operating a giant real estate Ponzi

scheme, stealing in excess of $80 million dollars from numerous investors, both large and small.

### II.  JURISDICTION AND VENUE

This adversary proceeding is brought in connection with Defendant's case Number 12-

30802 under Chapter 7 of Title 11 of the United States Code Section 523(c)  and Title 289 of the

United States Code Section 157(b) and 1334. This case is a proceeding to determine the

dischargeability of debts. This adversary proceeding is a "core proceeding" as provided in Title

11 of the United States Code Section 157(b)(2)(1). Venue is proper in this court pursuant to Title

28 of the United States Code, Section 1409.

### III.  PARTIES

**A.  Plaintiffs-The Feather River Property**

1.  Dan Brune is lives in Santa Cruz and invested with William F. Garlock  in the Feather

River Property.

2. Ella Thomas lives in San Mateo County and who invested with William F. Garlock in the Feather River Property.

3. Bat Ami Gordon lives in Los Angeles County and who invested with William F. Garlock in the Feather River Property.

4. James and Barbara Niles are individuals, husband and wife who reside in San Mateo County and who invested with William F. Garlock in the Feather River Property.

5. The estate of Mary Kay Parks, an individual, who resided in Monterey County, California and owned a 40.42% interest in the Feather River Property as trustee of the Mary Kay Parks 1999 Trust who invested with William Garlock in the Feather River Property.

6. S. Claudia M. Cecillon as an individual who resides in San Francisco County and as Trustee of the Cecillon Family Trust, invested with William Garlock in the Feather River Property and the Museum Parc Garage.

7. Mark Stuhlken invested in the Feather River property via an LLC.

**Plaintiffs-The Museum Parc Garage**

8. Douglas A. Smith lives in Palo Alto, Santa Clara County, California.

9. Harvey Billig III and Melanie Billig are husband and wife who reside in Carmel, Monterey County California and invested in the Museum Parc Garage.

10. Norman and Edith Van Woerkom are husband and wife who reside in Los Gatos, Santa Clara County, California and invested in the Museum Parc Garage.

11. Joan Olmstead lives in Florida and invested in the Museum Parc Garage.

12. Shirley Nason Greenwood lives in Santa Cruz, Santa Cruz County, California and invested in the Museum Parc Garage.

13. Plaintiff   Peter and Leslie Mathews are individuals who reside in Marin County California who made numerous investments with William F. Garlock including the Museum Parc Garage, and 642 Harrison on behalf of themselves and various family trusts.

14. The individuals listed in paragraphs 8 -13 invested in a parking garage located at the corner of Third and Folsom Street in San Francisco. This property will be referred to hereinafter as "The Museum Parc Garage."

**Plaintiffs-Museum Parc Retail Project**

15. Plaintiffs Frank Angelo Alioto and Rosemary Alioto are husband and wife who reside in San Rafael, Marin County, California and are bringing suit as Trustees of the Alioto Family Trust. They invested in the Museum Parc Retail project.

16. Plaintiffs John H. Warren and Sandra A. Warren are husband and wife who reside in California and are bringing suit as Trustees of the Warner Family Trust. They invested in the Museum Parc Retail project. They invested in the Museum Parc Retail project.

17. Plaintiff Tina Murchison lives in Salzer, Texas, and is bringing suit on behalf of and as Successor Trustee of the Robert R. Avis Trust. They invested in the Museum Parc Retail project.

18.  Plaintiff Sumner & Surfside LLC is a Nevada limited liability company, a company organized and existing under the laws of the State of California, with its principal place of business in Santa Cruz, California. They invested in the Museum Parc Retail project.

19. Plaintiff George M. Berberich lives in Emerald, San Mateo County, California. They invested in the Museum Parc Retail project.

20. Plaintiffs Ryoji Sakaue and Kiyoko Sakaue are husband and wife who reside in Watsonville, California. They invested in the Museum Parc Retail project.

21. Lightsprings Holdings LLC is a California limited liability company, with its principal place of business in Groveland, California. They invested in the Museum Parc Retail project.

22. All of the plaintiffs listed above in paragraphs are investors and owners of the retail parcel of a property located at the corner of Third and Folsom Street in San Francisco, California, known as Museum Parc, hereinafter referred to as " the Museum Parc Retail Parcel" .

### Plaintiffs-Peter and Leslie Mathews

23. Peter Mathews and Leslie Mathews are, and at all time relevant herein were, persons over the age of eighteen residing in Marin County, California.

24. Peter Mathews and Leslie Mathews are the duly appointed trustees of the Peter Greene Mathews and Leslie Ann Davis Mathews Revocable Inter Vivos Trust ("Mathews Trust") and bring this action on behalf of the trust.

25. Peter Mathews and Leslie Mathews are the duly appointed trustees of the Jeffrey Robert Mathews Irrevocable Trust ("Jeffrey Trust") and bring this action on behalf of the trust.

26. Peter Mathews and Leslie Mathews are the duly appointed trustees of the Ryan Davis Mathews Irrevocable Trust ("Ryan Trust") and bring this action on behalf of the trust.

27. The plaintiffs referred to in the previous properties all invested in numerous properties with William Garlock.

28. Plaintiff Monica Hujazi is an individual who retained Garlock to handle mortgage services for her.

### Plaintiffs-642 Harrison Street Investment

29. Plaintiff Clark Hutchings is a individual who invested with William F. Garlock in 642 Harrison Street.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 6 of 58

30. Plaintiff Lisa Faria is a individual who invested with William F. Garlock in 642 Harrison Street.

31. Albert Plute is a individual who invested with William F. Garlock in 642 Harrison Street.

32. Robert Foppoli lives in California and invested in real estate with William F. Garlock. in 642 Harrison Street.

## Remaining Investors

33. Global Ventures LLC is a limited liability company who invested in real property with William Garlock.

34. Plaintiff Richard Harrington is an individual, who resides in Florida and invested in real estate with William F. Garlock.

35. Plaintiff Wag Hotels in a California Corporation and invested in real estate with William Garlock.

36. Plaintiff Mylene Ansari is an individual who invested in real estate properties and was an employee of William Garlock.

37. Dereck Kozakco is a contractor who performed services for Garlock in San Mateo County.

38. Gary Ceccato is an individual who lives in San Mateo County and invested in real estate including the trailer park located 1836 Woodland Avenue with William Garlock.

39. Robert Montgomery lives in San Mateo County and invested with William F. Garlock

40. Jina Farzimpour lives in San Mateo invested in real estate with William F. Garlock.

41. Leonard Sklar lives in San Mateo County, and invested in real estate with William Garlock.

42.  Mark Stuhlken is an individual who is trustee for the Stuhlken Family Trust, located in Redmond Washington whose family invested in a real estate investment with William F. Garlock.

43. Plaintiff Greg and Jeannie MacDougall are individuals who reside in San Mateo County, California.

44.  Plaintiff Erica Stanley is an individual residing in Santa Clara County.

45.  Plaintiff Karl Kreidt lives in California and invested with William Garlock.

**B. <u>Defendants</u>**

46. Defendant William F. Garlock is an individual, a licensed real estate broker (DRE # 00483060), resides in Atherton, California, and does business in Menlo Park, California.

47. Defendant Rosemary Garlock is a natural person and the wife of defendant William F. Garlock and resides in Atherton, California.

## IV.     <u>FACTS RE FEATHER RIVER</u>

48. Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

49. The investors in the Feather River Property are Ella Thomas, Dan Brune, as  Brune Oroville TIC, A California Limited Liability Company; James And Barbara Niles, Individuals; Niles Enterprises LLC Series 1, A Delaware Limited Liability Company.  Bat Ami Gordon,,  Mary Kay Parks, An Individual And As Trustee Of The Mary Kay Parks Trust, ;  Mark Stuhlken and S. Claudia M. Cecillon; An Individual And As Trustee Of The Cecillon Family Trust.

50. Feather River Village is a two parcel retail mall located at 495-491 Oro Dam Blvd Oroville, California.

51. Until September of 2007, Margaret Scheinman, Melvin Scheinman, and Alyce McLeod owned the Feather River Village.

52. At the time, the Feather River Village was not fully leased, not fully occupied, and had severe mold problems throughout the property. It would not generate enough cash flow to debt service the mortgages necessary to purchase the property.

53. In early 2007 William Garlock met with Margaret Scheinman, Melvin Scheinman, and Alyce McLeod and agreed to purchase the property. However it was agreed among the defendants that he was not going to purchase it from them directly, rather he was going to sell shares in the property to third parties.

54. It was also agreed that Garlock would have shell corporations he owned and controlled lease the vacant space in the shopping center so that the financial statements of the shopping center would appear more favorable to investors.

55. Garlock executed these leases.

56. Garlock began to market the properties. As part of this process he produced a brochure listing the investment benefits of the Feather River property.

57. He also wrote a "confidential private placement memorandum" setting forth the requirements and various specific details regarding the investment.

58. At the time that Garlock drafted these documents, he, knew about the true condition of the property.

59. Realizing that the property would not sell if the true condition of the property were know, defendants, and each of them decided that they would conceal the true condition of the property from any prospective purchasers.

60. Plaintiffs are informed and believe and thereon allege that they instructed their listing agent, Bud Turner, to tell prospective purchasers that they could not view all parts of the property because it would interfere with the lessor's operations. He was also instructed to conceal other negative facts.

61. When Mr. Turner objected to operating in this fashion, he was terminated from his agency position.

62. On or about September 2007, William F. Garlock, persuaded plaintiffs to invest in the Feather River Village as tenants in common.

63. As part of persuading the investors to purchase this property Garlock wrote out a and gave to each prospective investor a "confidential private placement memorandum."

64. To persuade plaintiffs to invest, Mr. Garlock represented to plaintiffs and each of them, in person, over the telephone, and by letters, in the brochure and the private placement memorandum and in various documents other sent through the United States mail that the following facts were true.

65. That the Feather River property was fully leased.

66. That the property consisted of 38,000 rentable square feet.

67. That as of October 31, 2007, the current owner of the property (the Scheinmans and Alice McLeod) had executed 23 leases for approximately one hundred percent (100%) of its rentable square feet of improvements.

68. That three of the units were leased to an affiliate of the Sponsor for 5 year terms.

69. That prior to the sale of the property the Sponsor (i.e. Garlock), or its affiliate, will enter into an easement to permit access to the property to the adjoining parcel owned by the

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 10 of 58

sponsor or its affiliate. Such easement will result in the purchasers receiving an $869,000 amortized over a five year period.

70. That Garlock had already spent hundreds of thousands of dollars to reface the exterior of the buildings and conduct mold remediation throughout the property.

71. That William F. Garlock and Garlock and Company had a long history of buying and reselling properties and that individual who invested with Garlock had made substantial financial returns.

72. The Garlock represented to that the Feather River Village had sufficient rental income from the tenants to generate the necessary monthly return on investment payments to the investors as well as the other related costs and expenses.

73. Mr. Garlock told the investors that he would take all necessary steps to manage the property and to insure that the underlying mortgages would be paid.

74. Mr. Garlock and represented that the Feather River Village retail parcel had an appraised value of ten million dollars ($10,000,000) and that they that he had an appraisal showing that the property was valued at that amount.

75. These statements were false.

76. The property was not fully leased. The lease with Garlock was a sham lease, the entities leasing the property did not intend to occupy the property, were not financially viable such that the entities could pay the rent.

77. The property did not consist of 38000 usable square feet, at least 6000 of those feet were unusable due to the condition of the property which was infected with mold.

78. There was no such easement for which the plaintiffs could be paid, this was a standard Garlock marketing come on, which he had used in numerous other schemes.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 11 of
58

79. The property was not worth 10 million dollars.

80. Garlock had no intention of managing the property as a separate entity. Rather this purchase was simply one more in an ongoing system of frauds that Garlock had been perpetuating.

81. Contrary to Mr. Garlock's representations and creation of the documents identified above , the retail parcel was not self-sustaining, the lease income did not even minimally generate enough cash to service the necessary expenses of operating Feather River Village as well as debt service the mortgage.

82. Mr. Garlock represented he would manage the operation of the property for the plaintiffs and as a condition of investing, required that they sign a contract with him allowing him to have absolute control of managing the property and that he could not be terminated for any reason.

83.  The purpose of this contractual clause was to enable Garlock to steal the rents.

84. Mr. Garlock represented to plaintiffs, particularly Mary Kay Parks, that it was wise and prudent for plaintiffs to invest all of their retirement funds and available capital with him.

85. To support his representations and assertions, Mr. Garlock produced income and balance statements and other financial data.

86. Plaintiffs allege that at the time that Garlock prepared these statements, he knew that the purpose of these statements was to induce investors to invest in the Feather River Village properties.

87. At the time that Garlock prepared these statements, he knew or should that the information they were including in the financial data was not accurate.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 12 of 58

88. Mr. Garlock represented to the plaintiffs that the financial data and statements provided were accurate pictures of the financial condition of the retail parcel of Feather River Village.

89. As part of his plan to get the individuals to invest, Mr. Garlock represented that he had an appraisal showing that the value of their investment was in excess of ten million dollars ($10,000,000).

90. Plaintiffs are informed and believe and thereon allege, that defendants, and each of them, conspired with the appraiser to inflate the value of the property.

91. Plaintiffs are informed and believe and thereon allege that the appraiser, for compensation received from defendants, inflated the appraisal value of the subject real property.

92. The facts alleged in Mr. Garlock's and the seller's representations and the documents above were not true.

93. In his "Ponzi scheme," Mr. Garlock would persuade individuals to invest in real estate projects such as the Feather River Village project by setting up transactions as part of a Starker Exchange under 26 U.S.C. section 1031 (Internal Revenue Code). The benefit of a Starker Exchange is that it permits the involved individuals to defer paying taxes on the increases in value on their property. Specific legal requirements govern the participation in this type of exchange.

94. In his "Ponzi scheme," Mr. Garlock would first purchase plaintiffs' properties pursuant to a Starker Exchange, thus acquiring all of plaintiffs' real estate.

95. Then Mr. Garlock, by means of various false representations, would persuade the investors to re-invest with him, permitting him to acquire their property for no cash outlay.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 13 of 58

96. Plaintiffs are informed and believe that Mr. Garlock also paid himself a real estate transaction fee on these transactions.

97. After the individuals had invested in the property in this case, Feather River village, Mr. Garlock engaged in the following actions.

98. Mr. Garlock would then cease making payments on the mortgages, quit paying dues, quit paying taxes, and quit paying the investors.

99. Defendant Rosemary Garlock is the primary shareholder of Karlo LLC, Karlo II LLC, and multiple other business entities, including limited liability companies, into which monies were siphoned from the owners' operational and loan accounts for the exclusive benefit of Mr. Garlock and his business entities.

100. Rosemary Garlock participated in the process of taking funds from the plaintiffs by taking money in and out of the various accounts for the purpose of making the funds difficult to trace, evading income taxes, and permanently depriving plaintiffs of their equity in the property.

101. Plaintiffs allege that among the various uses of the funds, Mr. and Mrs. Garlock personally and by means of their various business entities, including limited liability companies, siphoned off money to pay for Rosemary Garlock's show horses and Mr. Garlock's strings of polo ponies.

102. Additionally, Garlock through other Garlock business entities prepared falsified and unsecured note payables, loan payables, trade payables, advances, trade payables, accounting records, financial statements, and tax returns, which were then authorized for payment by defendants. These actions were done by these individuals with knowledge of

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 14 of
58

their falsity and illegality, and with the intent to deprive plaintiffs of their money and the equity in plaintiffs' property.

103. Disbursement checks and wire transfers of the misappropriated funds were authorized by Mr. Garlock. None of the siphoned accounting transactions were ever disclosed to or approved by the plaintiffs and most of these transactions were hidden in the financial statements and operational statements.

104. The tax benefits of the section 1031 Starker exchange would be negated and plaintiffs would have to pay substantial amounts of interest and income tax penalties if the loan was recorded only against some tenancy in common owners and not others.

105. Plaintiffs are informed and believe and thereon allege that Mr. Garlock and his various business entities and LLCs, including the above named defendants, have previously engaged in these patterns and business practices.

106. Pursuant to defendants William F. Garlock's agreement with plaintiffs, and each of them, plaintiffs were persuaded to invest approximately five million dollars . In return, Mr. Garlock promised to pay plaintiffs a fixed rate of return on their investment.

107. In these transactions, Mr. Garlock represented both himself and plaintiffs and paid himself a real estate commission fee.

## **FIRST CLAIM FOR RELIEF**
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(On Behalf of the Investors in the Feather River Property)**

1. Plaintiff incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

2. In all the above transactions, Garlock made following statements both in writing and orally regarding the Feather River Property.

3. That the property would cash flow.

4. That the property was fully leased

5. That the property value he represented it to be was the true value of the property.

6. That he would manage the property for the investors .

7. That he would pay the investors a guaranteed return.

8. These statements were false.

9. The properties did not cash flow, were not fully leased, were overvalued, and would not support the return he was promising.

10. Garlock made these statements knowing they were false.

11. Plaintiffs were justified in relying on plaintiffs representations because  Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

12. As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money if not their entire investment.

13. Wherefore plaintiffs request that Garlock's debts related to Feather River  be declared nondischargeable.

## V.    FACTS  RE THE MUSEUM PARC GARAGE

14. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

15. The investors in the Museum Parc Garage are : Claudia M. Cecillon; An Individual And As Trustee Of The Cecillon Family Trust;  Douglas A. Smith An Individual, Harvey Billig

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 16 of 58

Iii And Melanie Billig, Individuals,  Norman And Edith Van Woerkom, Individuals, Joan Olmstead An Individual Shirley Nason Greenwood, An Individual and Leslie and Peter Green Mathews on behalf of the Mathews Family Trust. .

16. Museum Parc is a building located at the corner of Third and Folsom Street in San Francisco. The building houses condominiums, a number of businesses including a health club and restaurants, and a parking garage.

17. The property ownership is divided into three sections. The parking garage is owned by a group of investors as tenants in common. The condominiums are owned by their residents. The retail parcel, which consists of the businesses operating in the building, is owned by plaintiffs as tenants in common.

18. There is the garage owners' association, the merchant owners' association, and the condominium owners' association.  These are under the umbrella of the master owners' association, which has a board of directors with three members.

19. The investors in the Museum Parc Garage are : Claudia M. Cecillon; An Individual And As Trustee Of The Cecillon Family Trust;  Douglas A. Smith An Individual, Harvey Billig Iii And Melanie Billig, Individuals,  Norman And Edith Van Woerkom, Individuals, Joan Olmstead An Individual Shirley Nason Greenwood, An Individual and Leslie and Peter Green Mathews on behalf of the Mathews Family Trust.

20. Garlock, both individually and through his agents, including Michael Conte, represented to the Plaintiffs the property would generate a guaranteed profit of 9% per year.

21. To support this representation, Garlock, faxed and mailed to the plaintiffs copies of financial statements which he represented were an accurate financial picture of the garage operations.

22.  In reliance of Garlock's representations about the income of the property, on or about November 12, 2004, the Plaintiffs purchased from Garlock's company GFT Properties,

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 17 of 58

LLC an interest of approximately 36 % interest as tenants in common in a public parking garage located at 300 Third Street in San Francisco, California, commonly known as Museum Parc Garage. The Plaintiffs paid $1,944,000 in cash and assumed the existing financing on the property. Again, the purchase was made in reliance on Garlock's guaranty that the property would generate at least 9% of net income each year.

23. Effective November 1, 2004, Garlock, through his company 3333 El Camino Real, LLC, executed a master lease under which Garlock assumed control for management of the garage.

24. Under the terms of the Master Lease, as tenant Garlock agreed that:
During all the Term of the Master lease, Rent per month shall be $74,333.33 (NNN).

Tenant shall be responsible for 100% of the NNN charges[1] on the property.

Tenant, at its sole cost shall maintain and repair the non-structural portions of the Premises (latent defects excepted) and every part thereof, including interior plumbing and electrical systems, and the interior portions of the Premises.

Tenant may … sublease all or part of the Premises, without receipt of Landlord's consent. … Each assignment or sublease shall be subject and subordinate to the provisions of the Master lease.

25. Garlock continued to pay the purported "net" income to the Plaintiffs each month until April 2008.

26. Plaintiffs also learned subsequently that Garlock was taking cash from the garage with the aid of the operations manager, Biruk Tadesse.

27. After learning that Garlock had failed to pay both property taxes and local parking taxes for the property, the Plaintiffs along with the other TIC owners gave Garlock notice of default of the master lease and demanded he immediately vacate the property.

---

[1] NNN Charges are the operating expenses for the property, including insurance and property and parking taxes.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 18 of 58

28. Plaintiffs are informed and believe and thereon allege Garlock, either individually or through his agents, removed the Computerized Valet Parking System from the garage after he received the notice of default. This equipment contained the cash receipts records.

29. Garlock also failed to turn over any rents collected for two weeks after the master lease was terminated or any deposit reserves previously received from current tenants.

30. The Plaintiffs also are informed and believe Garlock engaged in improper accounting practices and mismanagement of this property, including but not limited to, entering into certain notes payable and notes receivable with Garlock's other business entities and for which there was no written documentation.

31. Furthermore, as a result of Garlock's mismanagement of the property plaintiffs were forced to incur additional personal liability of approximately $631,884.00 (includes escrow charges) which they were forced to borrow to pay off past due property taxes and assessments related to Museum Parc.

32. In addition, as a result of a lawsuit brought by the Museum Parc tenants association for damages caused by Garlock's failure to maintain his obligations to the building, the plaintiffs were ordered to pay an award of $28,000 in attorney's fees.

33. To induce Plaintiffs to invest in Museum Parc, Garlock and his authorized agents, made material false representations to the authorized agents of Plaintiffs, and to each of them, regarding, among other things, the expected net income from the properties, plans for development of the properties, the expected return on investment in the Museum Parc and the ability to have Plaintiffs' investment in the Museum Parc returned.

34. When Defendants made these representations, they knew them to be false and made these representations with the intention to deceive Plaintiffs and to induce Plaintiffs to act in reliance or with the expectation that Plaintiffs would so act.

35. Plaintiffs, at the time these representations were made by Defendants and at the time the Plaintiffs purchased the properties or investments, were ignorant of the falsity of Defendants' representations and believed them to be true. In reliance on these representations, Plaintiffs were induced to and did purchase real property

36. Had Plaintiffs known of the actual facts, they would not have taken such action.

37. Plaintiffs' reliance on Defendants' representations was justified because Garlock and his agents were represented to the Plaintiffs and held themselves out as experienced and successful in their fields.

38. Garlock was represented to Plaintiffs as a successful real estate developer and financier and Garlock held himself out to the public as the same.

39. Furthermore, Garlock produced to plaintiffs, by fax and U.S. Mail, copies of documents that he represented orally were accurate financial statements, including balance sheets, income and expense statements, and profit and loss statements.

40. The true facts were that these financial statements were not an accurate financial picture of the operations of the Museum Parc Garage; rather they were a complete fiction.

41. Garlock and the other defendants knew that these representations were not accurate.

42. Similarly, Conte was introduced to the Plaintiffs as an experienced and successful investment advisor and someone with significant experience and success in dealing with Garlock.

43. As a direct and proximate result of the fraudulent conduct of Defendants, Plaintiffs were induced to invest in Museum Parc, by reason of which Plaintiffs have suffered damages including, but not limited to, the loss of or decrease in value of the initial investment, increased operating expenses, lost income and legal fees and costs.

44. In addition, when the property was up for sale, Garlock, through his agent Jonathan Fried, filed false foreclosure papers and attempted to deprive plaintiffs of the sale proceeds, claiming he was due $7,000,000 to himself. This was done by the filing of a counterfeited note.

45. As a result of that action, plaintiffs incurred additional losses of approximately $1,000,000.

### SECOND CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(The Museum Parc Garage)**

46. Plaintiff incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

47. In all the above transactions, Garlock made following statements regarding the Museum Parc Garage.

48. That the property would cash flow.

49. That the property value he represented it to be was the true value of the property.

50. That he would manage the property for the investors .

51. That he would pay the investors a guaranteed return of between 9-11%.

52. These statements were false.

53. The properties did not cash flow and would not produce the 9% the return Garlock was promising.

54. Garlock made these statements knowing they were false.

55. Plaintiffs were justified in relying on plaintiffs representations because Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

56. As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money in excess of $1,000,000.

57. In addition, Garlock stole significant amounts of cash from daily receipts.

58. Wherefore plaintiffs request that Garlock's debts be declared nondischargeable.

## VII. FACTS RE THE MUSUEM PARC RETAIL PROPERTY

59. The investors in the Museum Parc Retail Parc Property are: Frank Angelo Alioto And Rosemary Alioto As Trustees Of The Alioto Family Trust; John H. Warren And Sandra A. Warren, Trustees Of The Warren Family Trust; Tina Murchison, Successor Trustee Of The Robert R. Avis Trust; Sumner & Surfside LLD A Nevada Limited Liability Company; George M. Berberich, An Individual; Ryoji Sakaue, An Individual; Kiyoko Sakaue, An Individual; and Lightsprings Holdings LLC A California Limited Liability Company,

60. On or about September 2004, defendant William F. Garlock persuaded plaintiffs to invest in the retail parcel of Museum Parc as tenants in common.

61. Pursuant to defendant William F. Garlock's agreement with plaintiffs, and each of them, plaintiffs were persuaded to invest five million dollars ($5,000,000) in the retail parcel. In return, Mr. Garlock promised to pay plaintiffs a fixed rate of return on their investment.

62. All plaintiff investors except plaintiff George M. Berberich invested their funds via means of a Starker Exchange under 26 U.S.C. section 1031 (Internal Revenue Code).

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 22 of 58

63. In these transactions, Mr. Garlock represented both himself and plaintiffs and paid himself a real estate commission fee.

64. To persuade plaintiffs to invest, Mr. Garlock represented to plaintiffs in person, over the telephone, and by letters sent through the United States mail that the following facts were true.

65. Mr. Garlock represented that the building had sufficient rental income from the tenants to generate the necessary monthly (return on investment) payments to the investors as well as the other related costs and expenses.

66. Mr. Garlock represented he had two seats on the master owners' association board of directors and would act on behalf of plaintiffs and that this was easy for him to do because he had the majority of votes on the board of directors.

67. Mr. Garlock represented he would assume responsibility for handling the merchants' funds as they related to the payment of association dues and would do so in a straightforward and honest fashion and that he would pay the dues from the operating revenues from the retail parcel.

68. Mr. Garlock represented he would take all necessary steps to insure that the underlying mortgages would be paid because he held the majority of seats on the board of directors.

69. Mr. Garlock represented that the Museum Parc retail parcel had an appraised value of eight million dollars ($8,000,000).

70. Mr. Garlock represented he would manage the operation of the property for the plaintiffs and attend board of directors' meetings as plaintiffs' representative.

71. Mr. Garlock represented that the investment was "risk free."

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 23 of 58

72. Mr. Garlock represented it was wise and prudent for plaintiffs to invest all of their retirement funds and available capital with him.

73. To support his representations and assertions, Mr. Garlock produced documents.

74. Mr. Garlock produced income and balance statements and other financial data .

75. Mr. Garlock represented to the investors that the financial data and statements provided were accurate pictures of the financial condition of the retail parcel of Museum Parc.

76. As part of his plan to get the individuals to invest, Mr. Garlock provided an appraisal to each plaintiff showing that the value of their investment was in excess of eight million dollars ($8,000,000).

77. The appraisal firm Hamilton & Ricci that appraised the firm performed all of Mr. Garlock's appraisals on all of his property.

78. Plaintiffs are informed and believe and thereon allege that the appraisal firm, due to their relationship with Mr. Garlock, as well as for compensation, inflated the values of the subject real property.

79. The facts alleged in Mr. Garlock's representations and the documents above were not true.

80. Contrary to Mr. Garlock's representations and the documents above, the retail parcel was not self-sustaining.

81. Unbeknownst to plaintiffs, Mr. Garlock had, since as far back as 1992, been operating a "Ponzi scheme" whereby he, by various illegal means and methods, had been pyramiding his investments.

82. In his "Ponzi scheme," Mr. Garlock would persuade individuals to invest in real estate projects such as the Museum Parc project by setting up transactions as part of a Starker Exchange under 26 U.S.C. section 1031 (Internal Revenue Code). The benefit of a Starker

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 24 of 58

Exchange is that it permits the involved individuals to defer paying taxes on the increases in value on their property. Specific legal requirements govern the participation in this type of exchange.

83. In his "Ponzi scheme," Mr. Garlock would first purchase plaintiffs' properties pursuant to a Starker Exchange, thus acquiring all of plaintiffs' real estate.

84. Then Mr. Garlock, by means of various false representations, would persuade the investors to re-invest with him, permitting him to acquire their property for no cash outlay.

85. Plaintiffs are informed and believe that Mr. Garlock also paid himself a real estate transaction fee on these transactions.

86. After the individuals had invested in the property in this case, Museum Parc, Mr. Garlock engaged in the following actions.

87. Mr. Garlock contacted the tenants of the retail parcel. He then offered the tenants cash, in excess of $50,000, to sign leases showing that the tenants were paying substantially higher amounts of rent than their current leases.

88. Mr. Garlock would then take these leases as evidence of increased value, and put additional liens against the building, usually without the investors' consent.

89. When Mr. Garlock did get the investors' consent, he did so by representing that the increased payments would be covered by using the borrowed funds for improving the building in which the tenants had invested.

90. To support these claims of increased value, Mr. Garlock would have the property re-appraised by Hamilton Ricci. Not surprisingly, the buildings would then appraise at a greater value than they had been previously appraised.

91. Mr. Garlock would then use his contacts with various financial institutions and investors to refinance the building at a higher amount and take the additional cash for himself.

92. Mr. Garlock would then cease making payments on the mortgages, quit paying dues, quit paying taxes, and quit paying the investors.

93. This is the identical pattern and practice he engaged in concerning the Menlo Management Company mortgage.

**2. The Menlo Management Company Mortgage.**

94. In early 2007, Mr. Garlock contacted the plaintiffs by telephone and in writing and requested that he be permitted to put an additional note of 2.5 million dollars ($2,500,000) on the retail parcel.

95. Mr. Garlock represented to plaintiffs that the property would be able to debt service the payments on the mortgage.

96. During this same time period, unbeknownst to plaintiffs, Mr. Garlock - individually and in his capacity as a principal in Garlock & Company, William F. Garlock & Company, Garlock & Company, Credit National De Geneve, Credit National De Geneve LLC, Credit National De Geneve, Inc., Karlo LLC, Karlo II LLC, JBUDD LLC, 2 G Corporation, and Third and Folsom LLC - was engaging in the practice of paying the tenants cash secretly in order to obtain from them leases showing a higher amount of rent than the tenants were actually paying.

97. Plaintiffs are informed and believe and thereon allege that in March of 2008, Mr. Garlock paid the owner of a Thai restaurant in the Museum Parc retail space, the approximate sum of sixty thousand dollars ($60,000) in cash in exchange for this tenant signing a lease in which the rent was substantially higher than what Cham was initially paying.

98. Mr. Garlock then told plaintiffs/investors that Cham was paying a higher amount of rent than what Cham was actually paying.

99. Plaintiffs are informed and believe and thereon allege that in April of 2008, Mr. Garlock paid the owner of Chat Café, one of the tenants in the Museum Parc retail space, the approximate sum of fifty thousand dollars ($50,000) in cash in exchange for the tenant signing a lease in which the rent was substantially higher than what Chat Café was initially paying.

100. Mr. Garlock then told plaintiffs that Chat Café was paying a higher amount of rent than what it was actually paying.

101. The reason that Mr. Garlock carried out this practice was to justify an increased value for the building.

102. The lenders of the funds for the 2.5 million dollar second mortgage were defendants Menlo Management Company and St. Francis Investment III, who were private lenders.

103. Plaintiff is informed and believes and thereon alleges that Menlo Management Company and St. Francis Investment III are partners, and were partners in the 2.5 million dollar loan.

104. Plaintiffs are informed and believe and thereon allege that defendants Menlo Management Company and St. Francis Investment III have a long standing relationship with Mr. Garlock and have financed properties for him previously.

105. Plaintiffs are informed and believe and thereon allege that Mr. Garlock is Menlo Management Company's biggest borrower.

106. Plaintiffs are informed and believe and thereon allege that the lending transactions between the Garlock entities and Menlo Management Company and St. Francis Investment III have

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 27 of 58

not been arms length transactions, but rather have been done to advance Mr. Garlock's financial interests at the expense of the borrowers.

107. Mr. Garlock represented to each plaintiff that he had the agreement of each of the plaintiffs to place the mortgage on the property.

108. All of the investors said Mr. Garlock could go ahead with the refinance if he obtained the signatures and permission of each plaintiff that each plaintiff would agree to the additional financing on the property.

109. Mr. Garlock also represented that he would be responsible for making the payments to Menlo Management Company and would be responsible for repaying the loan.

110. Mr. Garlock opened an escrow at North American Title Company to perform the legal duties necessary for the refinance.

111. Mr. Garlock has had a long-standing relationship with North American Title Company, and its title officer, defendant Millie Espinoza, and they have handled all of Mr. Garlock's escrows, doing at least eighty escrows for him over the past three years.

112. Plaintiff George Berberich repeatedly told Mr. Garlock, in person and in writing, that under no circumstances would Mr. Berberich agree to refinance the building.

113. Mr. Berberich also told defendant North American Title Company that under no circumstances was it to refinance the building or record any liens against the property and that Mr. Berberich would not sign any documents to that effect.

114. Mr. Berberich did not sign any documents authorizing a second mortgage or deed of trust secured against the Museum Parc retail parcel.

115. In order to refinance the building, Mr. Garlock told Mr. Berberich that he would repurchase his share.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 28 of 58

116. Pursuant to a written agreement between Mr. Garlock and Mr. Berberich, Mr. Garlock deposited $60,000 of earnest money in an account at North American Title Company to be used for purchasing Mr. Berberich's 16.98% interest in the Museum Parc retail parcel.

117. Pursuant to the terms of the escrow instructions, if Mr. Garlock failed to purchase Mr. Berberich's share of the property, Mr. Garlock forfeited the deposit.

118. Mr. and Mrs. Garlock have signed many of the loans and personal guarantees in the Garlock's business entities, companies, limited liability companies, and corporations.

119. Mr. Garlock, as the managing member of the Garlock businesses, has systematically siphoned monies from the owners' property operational and loan accounts, with the cooperation and complicity of defendants Rosa Rodriguez, Cheryl Tanguay, Phil Clock, and Thomas McKeithen, employees of the Garlock businesses, without any disclosure to plaintiffs or authorization from plaintiffs.

120. Mr. Garlock would routinely move these funds through the numerous business entities, including LLCs, he had established, which are in excess of 100. These include but are not limited to Garlock & Company; William F. Garlock & Company, Inc; Garlock & Company, Inc.; Credit National De Geneve; Credit National De Geneve LLC; JBUDD LLC; 2 G Corporation, and Third & Folsom LLC.

121. As the primary managing member of each of his business entities, including limited liability companies, Mr. Garlock conspired, with the complicity of the other defendants – including but not limited to Rosemary Garlock, Jason Garlock, Garlock & Company; William F. Garlock & Company, Inc; Garlock & Company, Inc.; Credit National De Geneve; Credit National De Geneve LLC; JBUDD LLC; 2 G Corporation, and Third & Folsom LLC - to siphon off from the owners' operational and loan funds accounts, from

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 29 of 58

the multiple properties managed by defendants for the exclusive benefit of those business entities that Mr. Garlock owned and managed, what appeared on accounting records to be notes payable but for which there is no documentation and no authorization from plaintiffs and relevant property owners.

122. Defendant Rosemary Garlock is the primary shareholder of Karlo LLC, Karlo II LLC, and multiple other business entities, including limited liability companies, into which monies were siphoned from the owners' operational and loan accounts for the exclusive benefit of Mr. Garlock and his business entities. Rosemary Garlock participated in the process of taking funds from the plaintiffs by taking money in and out of the various accounts for the purpose of making the funds difficult to trace, evading income taxes, and permanently depriving plaintiffs of their equity in the property.

123. Plaintiffs are informed and believe and thereon allege that among the various uses of the funds, Mr. and Mrs. Garlock personally and by means of their various business entities, including limited liability companies, siphoned off money to pay for Rosemary Garlock's show horses and Mr. Garlock's strings of polo ponies. In addition, Mr. Garlock diverted funds to fly polo ponies to California from Argentina.

124. Additionally, Karlo LLC, Karlo II LLC, JBUDD LLC, 2 G Corporation, and other Garlock business entities prepared falsified and unsecured note payables, loan payables, trade payables, advances, trade payables, accounting records, financial statements, and tax returns, which were then authorized for payment by defendants Rosa Rodriguez, Cheryl Tanguay, Thomas McKeithen, and Phil Clock. These actions were done by these individuals with knowledge of their falsity and illegality, and with the intent to deprive plaintiffs of their money and the equity in plaintiffs' property.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 30 of 58

125. Disbursement checks and wire transfers of the misappropriated funds were authorized by Mr. Garlock. None of the siphoned accounting transactions were ever disclosed to or approved by the plaintiffs and most of these transactions were hidden in the financial statements and operational statements, certified to be true by defendant Nichols, Rick & Company, CPAs.

126. Plaintiffs are informed and believe and thereon allege that Mr. Garlock is the managing member of Karlo LLC. This business entity was used by Mr. Garlock to siphon money from various real properties managed by Garlock for plaintiffs through what appeared on accounting records to be notes payable but for which there is no documentation and no authorization from plaintiffs.

127. Plaintiffs are informed and believe and thereon allege that the managing member of Karlo II LLC is Credit National de Geneve. This business entity was used by Garlock to siphon money from plaintiffs, including proceeds of the 2.5 million dollar mortgage. This was done through what appeared on accounting records to be notes payable but for which there is no documentation and no authorization from plaintiffs.

128. Plaintiffs are informed and believe and thereon allege that at all times relevant herein defendants Menlo Management Company, Robert C. Gould, and Greg Gilbert conspired with Mr. Garlock and Credit National de Geneve LLC, Credit National de Geneve, Inc. (a Delaware corporation), and Credit National de Geneve, Inc. (a California Corporation) to defraud the property owners of Museum Parc by funding a second mortgage in the amount of 2.5 million dollars without 100% unanimous approval by the property owners.

129. Defendants Menlo Management Company, Mr. Gould, and Mr. Gilbert were fully aware of the express requirement in the various loan documents and the tenancy in common

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 31 of 58

agreements that 100% unanimous approval by the property owners was required before any secondary financing was to be recorded against plaintiffs' property.

130. Defendants Menlo Management Company, Mr. Gould, and Mr. Gilbert negligently and fraudulently chose to fund this second mortgage and record it against the property, even though they knew that plaintiff George M. Berberich, a property owner with 16.9% ownership, disapproved of the funding of this loan and that the other plaintiffs had given their assent only on the condition that all of the plaintiffs agreed to the refinance.

131. The tax benefits of the section 1031 Starker exchange would be negated and plaintiffs would have to pay substantial amounts of interest and income tax penalties if the loan was recorded only against some tenancy in common owners and not others.

132. Menlo Management Company was paid a fifty thousand dollar ($50,000) loan origination fee for the funding of this loan.

133. Menlo Management Company funded this loan under loan terms of ten percent (10%) per annum, due and payable within six months. This loan was funded August 1, 2007 with a due date of January 31, 2008.

134. The attempt to place this type of loan with this short a due date, at a time when interest rates were at three percent rate, was not only negligent but part of Mr. Garlock's ongoing criminal enterprise and plan to repurchase the property at the sale or by agreement with Menlo Management Company and St. Francis Investment III.

135. Plaintiffs are informed and believe and thereon allege that Mr. Garlock and his various business entities and LLCs, including the above named defendants, have previously engaged in these patterns and business practices.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 32 of 58

136. Plaintiffs are further informed and believe that Menlo Management Company knew that these loan proceeds were being diverted and siphoned away from the property for the exclusive benefit of Mr. Garlock and his various business entities.

137. Immediately after the loan was recorded, Garlock took all the loan proceeds and appropriated them for his own personal use and purposes.

138. On or about March 2009, the plaintiffs learned that the 2.5 million dollar loan was recorded and that the funds were siphoned from the property and deposited into the Desert Commercial Bank of Palm Springs, California, for the exclusive benefit of Rosemary, Jason, and William Garlock.

139. Plaintiffs are informed and believe and thereon allege that at all times relevant herein defendants North American Title Insurance Company and Millie Espinosa, escrow officer, conspired with Mr. Garlock, the two Garlock & Company defendants, William F. Garlock & Company, Inc., and the three "Credit National de Geneve" defendants to defraud the property owners of Museum Parc by recording a second mortgage in the amount of 2.5 million dollars without 100% unanimous approval by the property owners.

140. Defendants North American Title Insurance Company and Millie Espinosa, escrow officer, were fully aware of the expressed requirement under the tenant in common property owners agreement, 100% unanimous approval by the property owners was required before any secondary financing was to be recorded against their property.

141. The escrow instructions also reflected that the signature of all the plaintiffs would be required to complete the transaction.

142. North American Title Insurance Company and Millie Espinosa, escrow officer, negligently and fraudulently chose to record this second mortgage, even though they were advised that

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 33 of 58

George M. Berberich, a property owner with 16.9% ownership, disapproved of the funding of this loan.

143. Plaintiffs are further informed and believe and thereon allege that North American Title Insurance Company was paid ten thousand dollars ($10,000) for the issuance of title insurance and escrow costs.

144. Plaintiffs are further informed and believe and thereon allege that North American Title Insurance Company and Ms. Millie Espinosa failed to question the short six month loan term, the ten percent (10%) annual interest rate, and the fifty thousand dollar ($50,000) loan fee of Menlo Management Company.

145. This loan was funded August 1, 2007, as recorded by North American Title Insurance Company. North American Title Insurance Company disbursed the loan proceeds of $2,444,000 to Garlock & Company, per the instructions of William F. Garlock, even though North American Title Insurance Company knew that Mr. Garlock only had less than five percent (5%) of the property ownership.

146. When North American Title Insurance Company released the loan proceeds of $2,444,000 to Mr. Garlock without authorization, let alone correspondence, from 100% of the property owners as required by the tenancy in common ownership agreement, North American Title Insurance Company assisted Mr. Garlock in defrauding the plaintiffs.

147. Plaintiff's are informed and believe and thereon allege that North American Title Insurance Company conspired with Mr. Garlock to siphon the loan proceeds by disbursing these funds without permission of all the plaintiffs and without complying with the escrow instructions.

**3. . Club One**

148. Club One is a Health and Fitness Club which is one of the tenants of Museum Parc.

149. Plaintiffs are informed and believe and thereon allege that William Garlock is a stockholder in Club One.

150. Plaintiffs are informed believe and thereon allege that John and Jill Kinney are the owners of Club One.

151. In June of 2007, as part of his pattern and practice of falsifying leases to increase the amount he could borrow against a piece of real property, William Garlock agreed with Club One's owners, defendants John and Jill Kinney, that he would "reimburse" Club One $500,000 for "tenant improvements." These "tenant improvements" were never installed.

152. In exchange for this payment, John and Jill Kinney, both on behalf of Club One and as individual guarantors, signed a new lease that increased from $32,000 to $54,000 per month.

153. Mr. Garlock gave the Kinney's five hundred thousand dollars ($500,000) of the proceeds of the Menlo Management Company mortgage, funds to which the Kinneys were not entitled. These funds were paid out of the Menlo Management Company escrow at North American Title Insurance Company.

154. On or about June, 2004, William Garlock attempted to persuade plaintiffs, and each of them, to invest in the Museum Parc Retail Parcel.

155. To get them to invest, Mr. Garlock made the following representations that Mr. Garlock knew were false. Mr. Garlock made the false representations with the intent to deceive and defraud plaintiffs and to induce plaintiffs to act in reliance on the representations.

156. Mr. Garlock represented that if plaintiffs invested in the property he would pay them a rate of return of nine to fifteen percent (9 - 15% ) depending on the individual investor.

157. Mr. Garlock represented that the property, which consisted of a number of stores and restaurants, produced sufficient cash every month to cover the payments to the investors as well as to pay Museum Parc association dues.

158. Mr. Garlock represented that there was no risk to the investors because he had two seats on the Museum Parc master owners' association board of directors, representing both the retail and garage owners, thus giving him board control.

159. Mr. Garlock also represented that he would attend the board meetings and look after the interests of the plaintiffs.

160. As part of the representations to plaintiffs, Mr. Garlock provided the following documents to plaintiffs: certified monthly, quarterly, and annual financial statements; year-end investor owners tax letters; property annual federal and California tax returns; and parking tax assessment for the City and County of San Francisco Parking Assessment Board, verifying that the financial statements and the property's operational statements were true and correct.

161. Mr. Garlock also provided an appraisal to the investors showing a value of the building for 18 million dollars. This appraisal was performed by Hamilton & Ricci

162. The true facts were different than appraised.

163. The Museum Parc retail parcel itself was not generating sufficient cash to pay its operating expenses and association dues, let alone the investors.

164. There were not enough funds generated to service the mortgages against the property and to pay the investors.

165. Hamilton & Ricci performed all of Mr. Garlock's appraisals.

166. As a result of the relationship between Mr. Garlock and Hamilton & Ricci, Hamilton & Ricci would appraise Mr. Garlock's properties and value them substantially higher than market value, which permitted Mr. Garlock to borrow more money against the buildings.

167. Hamilton & Ricci knew that they were overvaluing the buildings.

168. The financial statements Mr. Garlock produced were false.

169. Mr. Garlock knew this because he provided false information to the accountants, who knew that the information they were receiving was false.

170. Mr. Garlock provided these appraisals and financial statements to the plaintiffs for the purpose of persuading them to invest in the building. The true value of the property was substantially less than the value showed in the appraisal.

171. As a result of Mr. Garlock's representations, plaintiffs were induced to invest their money in the Museum Parc property.

172. The plaintiffs, at the time of Mr. Garlock's representations and at the time plaintiffs took the actions alleged herein, were ignorant of the falsity of the representations. Had plaintiffs known the actual facts, plaintiffs would not have taken such action.

173. Plaintiff incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

174. In all the above transactions, Garlock made following statements regarding the various properties.

175. That the property would cash flow.

176. That the property was fully leased

177. That the property value he represented it to be was the true value of the property.

178. That he would manage the property for the investors .

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 37 of 58

179. That he would pay the investors a guaranteed return.

180. These statements were false.

181. The properties did not cash flow, were not fully leased, were overvalued, and would not support the return he was promising.

182. Garlock made these statements knowing they were false.

183. Plaintiffs were justified in relying on plaintiffs representations because Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

184. As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money if not their entire investment.

### THIRD CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(The Museum Parc Retail Property)**

185. Plaintiff incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

186. In all the above transactions, Garlock made following statements regarding the various properties.

187. That the property would cash flow.

188. That the property was fully leased.

189. That the property value he represented it to be was the true value of the property.

190. That he had the ability to transfer the property. This representation was made to Ms. Farzimpour.

191. That he would manage the property for the investors .

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 38 of 58

192. That he would pay the investors a guaranteed return.

193. These statements were false.

194. The properties did not cash flow, were not fully leased, were overvalued, and would not support the return he was promising.

195. Garlock made these statements knowing they were false.

196. Plaintiffs were justified in relying on plaintiffs representations because Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

197. As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money if not their entire investment.

198. Wherefore plaintiffs request that Garlock's debts be declared nondischargeable.

## VII.  THE FACTS RE 642 HARRISON STREET

199. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

200. The plaintiffs in the 642 Harrison Street, in Oakland California are the Mathews Family Trusts, Lisa Faria, Clarke Hutchings, Albert Plute and Robert Foppoli.

201. In 2004, Garlock induced the plaintiffs to invest in this property by making the following representations to plaintiffs in writing and orally.

202. That the property was fully leased.

203. That the property had sufficient cash flow to pay for itself and to pay the investors a high rate of return.

204. That the property had an easement to an adjoining property which generated rent for its use every month which added value to the building.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 39 of 58

205. That the value of the building was $24,000,000

206. These facts were not true.

207. The building was not fully leased, it was thirty percent (30%) occupied and did not cash flow.

208. The" fully leased" statement was a scam designed by Garlock where various LLC's. created by Garlock, none of which had any assets, signed leases on the property even though they were completely incapable of paying any rent.

209. There was no easement associated with the property.

210. The building was not worth $24,000,000, it was worth substantially less.

211. Garlock also produced false financial statements and appraisals and provided them to plaintiffs.

212. Garlock also acted as a broker on behalf of plaintiffs, paying himself management fees and commissions on these transactions.

213. Plaintiffs invested sizeable amounts of money in the building and, as a result, lost their entire investment which was approximately $5,000,000.

214. Plaintiffs subsequently received a stipulated judgment in a state court action based on these facts from Garlock in the amount of $3,000,000. It is this judgment they wish to have determined non-dischargeable.

**FOURTH CLAIM FOR RELIEF**
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
(The 642 Harrison Investment)

215. Plaintiff incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 40 of 58

216. In all the above transactions, Garlock made following statements regarding the various properties.

217. That the property would cash flow.

218. That the property was fully leased

219. That the property value he represented it to be was the true value of the property.

220. That he would manage the property for the investors.

221. That he would pay the investors a guaranteed return.

222. These statements were false.

223. The properties did not cash flow, were not fully leased, were overvalued, and would not support the return he was promising.

224. Garlock made these statements knowing they were false.

225. Plaintiffs were justified in relying on plaintiffs representations because Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

226. As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money if not their entire investment.

227. Wherefore plaintiffs request that Garlock's debts be declared nondischargeable.

## X. <u>FACTS RE THE MATHEWS CLAIMS.</u>

228. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

229. The Mathews invested in numerous projects with Garlock including the Museum Parc Garage, and 642 Harrison, and were victims of Garlock's conduct as described above. As a result, in a state court action they received a $3,000,000 dollar judgment against Garlock.

Their actual losses were in excess of 30 million dollars. It is this judgment that they seek to have declared non-dischargeable. The facts relating to the Museum Parc Garage apply to them and 642 Harrison are applicable to their situation.

### FIFTH  CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(Peter and Leslie  Mathews and the Mathews Family Trust)**

230. Plaintiff incorporates each and every allegation set forth in  the preceding paragraphs as though fully set forth herein.

231. In all the above transactions, Garlock made following statements regarding the various properties.

232. That the property would cash flow.

233. That the property was fully leased

234. That the property value he represented it to be was the true value of the property.

235. That he would manage the property for the investors.

236. That he would pay the investors a guaranteed return.

237. These statements were false.

238. The properties did not cash flow, were not fully leased, were overvalued, and would not support the return he was promising.

239. Garlock made these statements knowing they were false.

240. Plaintiffs were justified in relying on plaintiffs representations because Garlock was a licensed real estate broker, he held himself out on his web site as an extremely experienced real estate investor, and he had numerous other credible individuals vouching for him.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 42 of 58

241.  As a result of Garlocks written and oral representations, plaintiffs, and each of them, lost substantial sums of money if not their entire investment.

242.  Wherefore plaintiffs request that Garlock's debts be declared nondischargeable, specifically the three million dollar judgment they received.

## XI.  FACTS RE MYLENE ANSARI

243.  Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

244.  Mylene Ansari was for a period of time an employee of William Garlock.  While she worked there, Garlock (1) failed to pay her wages due and (2) induced her to invest, by numerous fraudulent representations in the "Garlock loan fund."  As a result of these actions she received a state court judgment in the amount of  $25,000 for past due wages. This amount is non-dischargeable as a matter of law. She was also defrauded in the amount of approximately $60,000 by Garlock by fraudulent inducement to invest in the loan fund.

### SIXTH  CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(Mylene Ansari)**

245.  Plaintiff incorporates each and every allegation set forth in  the preceding paragraphs as though fully set forth herein.

246.  In all the above transactions, Garlock made following statements regarding the loan fund to Mylene Ansari as set forth below.

247.  Garlock also owes Ms. Ansari $25,000 in wages.

248.  Wherefore plaintiffs request that Garlock's debts be declared nondischargeable.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 43 of 58

# XII. FACTS RE MONICA HUJAZI

249. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

250. In 2011, Monica Hujazi, owned a piece of commercial real estate in Los Angeles. The existing first mortgage on the property was expiring and the lender was unwilling to extend the note.

251. Ms. Hujazi went and spoke to William Garlock, who is a licensed real estate broker.

252. Mr. Garlock told her that he could obtain her a new mortgage.

253. Ms. Hujazi agreed to let Garlock obtain a new mortgage for her.

254. What Garlock did instead however was something else.

255. He, along with Jonathan Fried, transferred ownership of the building to a separate LLC.

256. Fried then put the new LLC into bankruptcy.

257. As a result of Garlock and Fried's actions, Ms. Hujazi lost the entire building, which had a value of $10,000,000, of which $5,000,000 was equity.

258. It is this debt that plaintiff Hujazi seeks to have declared non-dischargeable.

## SEVENTH CLAIM FOR RELIEF
### (To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)
### 11 U.S.C §523(a)(2)(A)
### (Monica Hujazi)

259. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

260. Garlock, a real estate broker represented that he would assist Ms. Hujazi in obtaining a mortgage for her.

261. This representation was false.

262. At the time Garlock was approached by Ms. Hujazi, upon reviewing the property details, he decided to steal the property.

263. He then falsely transferred title to the property in an attempt to steal it.

264. As a result of Mr. Garlock and Mr. Fried's actions, as stated above, Ms. Hujazi lost the property.

265. Wherefore plaintiff seeks to have this debt declared non-dischargeable.


**EIGHTH CLAIM FOR RELIEF**
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by Fraud and Defalcation While Acting in a Fiduciary Capacity. )**
**11 U.S.C §523(a)(4)**
**(Monica Hujazi)**

266. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

267. At all times herein mentioned, Garlock was a real estate broker acting on behalf of the plaintiffs in these transactions, and as such, owed them a fiduciary duty.

268. Garlock breached his fiduciary duty to plaintiffs by lying to them, appropriating money that was rightfully theirs, over encumbering their properties, and by engaging in various other activities that profited himself ahead of the plaintiffs.

269. Wherefore plaintiffs request that the debts be declared nondischargeable.


**XIII. FACTS RE THE LOAN FUND**

270. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

271. The plaintiffs in the loan fund are Robert Conklin, Ronald Conklin, Norman and Edith Van Woerkom ,Dan Brune and Claudia Esquivel and Mylene Ansari.

272. Garlock, both individually and through his agents, presented to the Plaintiffs an investment opportunity with the Garlock Loan Fund, LLC. Investors purchased membership interests in the Garlock Loan Fund LLC at a price of $5,000 per unit with the promise of monthly interest income of 15% interest.

273. Garlock provided to the Plaintiffs a Summary of the Offering, which provided, among other things:

> The Fund intends to invest the net proceeds of this Offering in a portfolio of short-term (1-5 years) commercial mortgages that will general returns of approximately 15% per annum.

> The Fund intends that its mortgages will be generally concentrated in the San Francisco Bay Area…. The mortgages will be primarily be secured primarily (sic) with office properties, multi-family apartment properties, retail properties, mixed-use properties, commercial condominiums, industrial properties, and development sites.

> [A]ll investors in this Offering are guaranteed a 15% return on their investment by the Manager.

> The Manager will distribute a monthly return to all investors equal to fifteen percent (15%) per annum of each investment. Upon the repayment of principal by any borrower, the Manager will distribute to each investor their proportionate investment.

274. Garlock also provided the Plaintiffs with a copy of the Operating Agreement for Garlock Loan Fund, LLC, which provided, among other things:

> 5.3 B. **Limitations on Power of Manager(s).** The Manager(s) shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest: … (ii) Any act which would make it impossible to carry on the ordinary business of the Company.

> 5.5 **Performance of Duties; Liability of Manager(s).** … The Manager(s) shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

275. In addition, Garlock and Conte represented to the Plaintiffs that they could get their investment returned to them at any time. Mr. Garlock represented on numerous occasions

that such a return would be made upon receipt of written demand for return of the investment.

276.   On or about December 1, 2007, in reliance on the written and oral representations of Garlock and his agents, plaintiffs invested  in the loan fund..

277.   The true facts regarding the loan fund were that, in spite of Garlock's numerous written and oral representations regarding his management of the loan fund, none of them were true.

278.   Indeed, Garlock induced investment in the fund by presenting a note (the "Pensco Note) which he represented was part of the fund's investment portfolio.

279.   The Pensco note was secured by property in Oregon.

280.   This note had already been used as collateral for another loan by Garlock.

281.   Garlock, immediately after receiving the investment funds from the Plaintiffs, removed the note from the portfolio and then proceeded to borrow against it to fund his investment in another property, located at 642 Harrison.

282.   After that, Garlock then took the note and put it in his wife Rosemarie's 401k plan, claiming that the note was a personal asset.

283.   Garlock then brought suit to foreclose the note in Oregon. In that lawsuit he claimed that he was the owner of the note.

284.   Had Garlock been successful in this suit, (which he was not) he would have eliminated plaintiffs' interest in the note.

285.   The  plaintiffs investments in the loan fund were approximately $2,000,000.

As a result, the plaintiffs lost their entire investment in the loan fund.


**NINTH  CLAIM FOR RELIEF**
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(The Garlock Loan Fund)**

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 47 of 58

286.  Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

287.  To induce plaintiffs to invest in the loan fund, Garlock falsely represented both his real intentions and plans.

288.  Although Garlock said he would invest the money in sound real estate notes and investments, instead he appropriated the money and used it for his own purposes.

289.  The statements Garlock made to the investors were false.

290.  The investors were entitled to reasonably rely, and did rely on Garlock's representations.

291.  Wherefore the plaintiffs suffered damages.

292.  It is these debts related to the Loan fund that the plaintiffs seek to declare non-dischargeable.

## XIV. <u>FACTS RE JOAN KENT</u>

293.  Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth herein.

294.  Joan Kent was induced to invest in real estate with William Garlock in accord with Garlock's standard practices as set forth above.

295.  As a result, in a state court case, Joan Kent received a judgment of $296,350.44. It is this judgment which Ms. Kent seeks to have declared non-dischargeable

### <u>TENTH CLAIM FOR RELIEF</u>
### (To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)
### 11 U.S.C §523(a)(2)(A)
### (Joan Kent.)

296.  Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth herein.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 48 of 58

297. William F. Garlock induced Joan Kent to invest her funds in various real estate investments with him.

298. To induce her to invest, Garlock, written and orally, made statements regarding the condition and financial operation of the property.

299. Specifically Garlock alleged that the property cash flowed.

300. Garlock alleged that the property had a high net worth

301. Garlock alleged that if she invested the property would pay her a substantial return

302. These representations were false.

303. The true facts were that the property did not cash flow, was overencumbered, was not worth the amount Garlock claimed it was, and would not pay the return Garlock promised.

304. Plaintiff reasonably relied on Garlock's statements and invested her money.

305. As a result of Garlock's actions, plaintiff suffered losses in the amount of $260,000.

306. This amount was reduced to a judgment.

307. It is this debt that plaintiff seeks to declare non-dischargeable.

## .XIV. FACTS RE STUHLKEN FAMILY TRUST.

308. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

309. In September of 2007, the Stuhlken Family Trust was induced to invest in two real estate investments by William Garlock, by means of the various fraudulent devices described above.

310. Specifically, they invested in the following , an Assignment Note and Deed of Trust in sum of $100,000 from 15th & 1500 Broadway LLC, a California limited liability company dated September 1, 2007. They also invested in the loan fund.

311. These investments were worthless, because the 15th and 1500 Broadway property was not

leased, overencumbered, and did not have the cash to make the note payments regardless of

Garlock's representations to the contrary.

It is this debt that plaintiffs seek to have declared non-dischargeable.

### ELEVENTH CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(The Stuhlken)**

312. Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth

herein.

313. William F. Garlock induced Mark Stuhlken Senior to invest is funds in various real estate

investments with him.

314. To induce him to invest, Garlock, written and orally, made statements regarding the

condition and financial operation of the property.

315. Specifically Garlock alleged that the property cash flowed.

316. Garlock alleged that the property had a high net worth

317. Garlock alleged that if she invested the property would pay her a substantial return

318. These representations were false.

319. The true facts were that the property did not cash flow, was overencumbered, was not

worth the amount Garlock claimed it was, and would not pay the return Garlock promised.

320. Plaintiff reasonably relied on Garlock's statements and invested his money.

321. As a result of Garlock's actions, plaintiff suffered losses in the amount of $500,000.

### XVI. FACTS RE GREG AND JEANNIE MACDOUGAL

322. Plaintiffs reallege and reincorporate by reference the preceding paragraphs as though

fully set forth herein.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 50 of 58

323.   Plaintiffs were induced to invest in real estate with William Garlock in accord with

Garlock's standard practices as set forth above, specifically in a worthless real estate

partnership located at 3294  El Camino in  Palo Alto California.

324.   As a result, plaintiffs lost their entire investment of $230,000 and did not receive $60,000

in promised income.

<u>**TWELFTH CLAIM FOR RELIEF**</u>
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False
Pretenses, False Representations or Actual Fraud)
11 U.S.C §523(a)(2)(A)
(Greg and Jeannie MacDougal)**

325.   Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth

herein.

326.   William F. Garlock induced Greg and Jeannie MacDougal to invest her funds in various

real estate investments with him, including one located at 3294 El Camino Real.

327.   To induce them to invest, Garlock, written and orally, made statements regarding the

condition and financial operation of the property.

328.   Garlock alleged that the property cash flowed.

329.   Garlock alleged that the property had a high net worth

330.   Garlock alleged that if she invested the property would pay them a substantial return

331.   These representations were false.

332.   The true facts were that the property did not cash flow, was overencumbered, was not

worth the amount Garlock claimed it was, and would not pay the return Garlock promised.

333.   Plaintiff reasonably relied on Garlock's statements and invested their money.

334.   As a result of Garlock's actions, plaintiff suffered losses in the amount of $260,000.

335.   It is this debt that plaintiff seeks to declare non-dischargeable.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 51 of
58

## XVII. <u>FACTS RE GLOBAL VENTURES LLC</u>

336.   Plaintiffs reallege and reincorporate by reference the preceding paragraphs as though fully set forth herein.

337.   Global Ventures is a venture capital LLC, made up of a number of individuals including Irwan Sie.

338.   Garlock, by means of the various fraudulent representations and actions set forth above, induced Global to invest $1,025,000 in a Kern County Housing Development and $900,000 in a real estate project on Wolfe Road in Sunnyvale.

339.   Both investments were worthless, and Garlock did not even begin construction as represented.

340.   As a result, Global received two judgments against Garlock for both amounts.  It is these amounts that Global seeks to declare as nondischargeable.

### <u>THIRTEENTH CLAIM FOR RELIEF</u>
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(Global Investments)**

341.   Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth herein.

342.   William F. Garlock Global Investments to invest their funds in various real estate investments with him specifically $1,025,000 in a Kern County Housing Development and $900,000 in a real estate project on Wolfe Road in Sunnyvale.

343.   To induce investment, Garlock, written and orally, made statements regarding the condition and financial operation of the property.

344.   That he was going to construct substantial real estate improvements (buildings) on the property.

345. Specifically Garlock alleged that the property would property cash flow when the property was completed.

346. Garlock alleged that the completed project had a high net worth.

347. Garlock alleged that if Global invested the project would pay it a substantial return.

348. These representations were false.

349. The true facts were that the project did not cash flow, was overencumbered, was not worth the amount Garlock claimed it was, and would not pay the return Garlock promised.

350. Furthermore, Garlock appropriated the money and never began construction.

351. Plaintiff reasonably relied on Garlock's statements and invested its money.

352. As a result of Garlock's actions, plaintiff suffered losses in the amount of $1,900,000..

353. This amount was reduced to a judgment.

354. It is this debt that plaintiff seeks to declare non-dischargeable.

## VII. FACTS REGARDING 1893 WOODLAND EPA LLC

355. Plaintiffs reallege and reincorporate by reference the preceding paragraphs as though fully set forth herein.

356. The investors in this property are Gary and Beatrice Ceccato and Robert Montgomery.

357. In the year 2005, Ceccato and the Montgomerys were persuaded by William Garlock to invest in this property as tenants in common.

358. The project is a trailer park.

359. Ceccato and the Montgomerys each purchased a forty-four percent t(44%) in the property. The remaining twelve percent was owned by an LLC created by Mr. William Garlock, entitled 1836 Woodland EPA LLC.

360.   To induce the plaintiffs to invest, Garlock falsely represented that the trailer park was cash flowing such that an investment would be profitable, and that it would pay a substantial financial return to the plaintiffs.

361.   He also represented that in exchange for his keeping a twelve per cent interest (12%) in the property, he would manage the property and pay plaintiffs their share.

362.   The true facts were that the property did not cash flow, and Garlock had no intention of paying any money to plaintiffs, as illustrated by his very shortly after the property was purchased his stealing all of the rents and not paying any return to plaintiffs.

363.   Mr. Garlock also persuaded the mortgage company Cushman Rexrode to put an additional loan on the property, thereby encumbering the property with liens far in excess of its value.

364.   When the loan was granted, Garlock did not do as he had promised, which was to construct additional housing on the property, instead he took the loan proceeds and pocketed them.

365.   It was suggested by Garlock that Mr.Ceccato should give him a "deed in lieu of foreclosure" and Garlock would arrange for Ceccato's interest to be given to Rexrode Cushing and he would be eliminated from ownership of the property and would have no further liability.

366.   After receiving the deed, Garlock did not record the deed. He kept on stealing the rents and left Mr. Ceccato on title.

367.   Plaintiffs are informed and believe that Mr. Garlock may have fraudulently sold or transferred Ceccato's and Montgomery's interest in the property.

Case: 13-03174   Doc# 14   Filed: 11/25/13   Entered: 11/25/13 16:05:23   Page 54 of 58

# FOURTEENTH CLAIM FOR RELIEF
### (To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)
### 11 U.S.C §523(a)(2)(A)
### (Gary Ceccato and Robert Montgomery)

368. Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth herein.

369. William F. Garlock induced Gary and Beatrice Ceccato and Robert Montgomery.to invest their funds in various real estate investments with him including the above referenced trailer park.

370. To induce them to invest, Garlock, written and orally, made statements regarding the condition and financial operation of the property.

371. Garlock alleged that the property cash flowed.

372. Garlock alleged that the property had a high net worth

373. Garlock alleged that if she invested the property would pay them a substantial return

374. These representations were false.

375. The true facts were that the property did not cash flow, was overencumbered, was not worth the amount Garlock claimed it was, and would not pay the return Garlock promised.

376. Plaintiff reasonably relied on Garlock's statements and invested their money.

377. As a result of Garlock's actions, plaintiff suffered losses in the amount of $1,000,000.

378. Garlock has been stealing and continues to steal the rents from the property.

379. It is this debt that plaintiff seeks to declare non-dischargeable.

## XIX. FACTS RE JINA FARZIMPOUR

380. Plaintiffs reallege and reincorporate by reference the preceding paragraphs as though fully set forth herein.

381. On or about 2005, Ms. Farzimpour was induced to invest $2,000,000 with William F. Garlock for a property located on Mitten Drive in San Mateo.

382. Garlock acted as a broker in the transaction.

383. Garlock represented to her that he could sell her a percentage interest in the property and that he would look after her interests by managing the property.

384. These facts were not true.

385. Under the terms of the mortgage on the property, a sale of any interest in the property immediately made the mortgage due.

386. After Ms. Farzimpour gave Garlock her money, the bank foreclosed upon the property and Ms. Farzimpour lost her entire investment of two million dollars. .

387. It is this debt that Plaintiff seeks to have declared non-dischargeable.

### FIFTEENTH CLAIM FOR RELIEF
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(Jina Farzimpour)**

388. Plaintiffs reallege and reincorporate the preceding paragraphs as though fully set forth herein.

389. William F. Garlock induced Jina Farzimpour to invest her funds in various real estate investments with him on Mitten Drive in San Mateo.

390. To induce her to invest, Garlock, written and orally, made statements regarding the condition and financial operation of the property.

391. Garlock alleged that the he was the owner of the property and had the power to transfer title to her in any percentage share she desired.

392. This representation was false.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 56 of 58

393. The true facts were that a transfer of any portion of the property triggered the default clause and that the mortgage, which was substantial would become immediately due.

394. Plaintiff reasonably relied on Garlock's statements and invested her money.

395. Immediately after the transfer, the bank foreclosed on the property.

396. Garlock pocketed the proceeds of Ms. Farzimpour's investment.

397. Garlock also stole all the rents and payments during the foreclosure period.

398. As a result of Garlock's actions, plaintiff suffered losses in the amount of $2,000,000.

399. It is this debt that plaintiff seeks to declare non-dischargeable.

## XX. <u>FACTS RE ERICA STANLY</u>

400. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

401. In 2006, in Santa Clara County, a judgment after trial was entered into against Garlock and in favor of Stanly for Garlock's tortious violation of a lease agreement with Stanly. The total amount of this judgment was $516998.40

402. It is this amount of debt which plaintiffs seek declared nondischargeable.

403. A reading of the conclusions of law and findings of fact show that this debt was incurred by fraud in violation 11.U.S.C 532.

**SIXTEENTH CLAIM FOR RELIEF**
**(To Determine DISCHARGEABILITY of Debts for Property Obtained by False Pretenses, False Representations or Actual Fraud)**
**11 U.S.C §523(a)(2)(A)**
**(Erica Stanley)**

404. Plaintiffs reallege and reincorporate the proceeding paragraphs as though fully set forth herein.

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 57 of 58

405.    In 2006, in Santa Clara County, a judgment after trial was entered into against Garlock

and in favor of Stanly for Garlock's tortious violation of a lease agreement with Stanly.

The total amount of this judgment was $516998.40

406.    It is this amount of debt which plaintiffs seek declared nondischargeable.

407.    A reading of the conclusions of law and findings of fact show that this debt was incurred

by fraud in violation 11.U.S.C 532.

### PRAYER

Wherefore Plaintiffs pray:

1.  That the court make a determination that the indebtedness of Defendant to Plaintiffs is

nondischargeable:

2.  That the court determine the remaining issues and render a judgment for plaintiff in the

amount of their debts;

3.  For an order awarding attorney's fees and costs incurred herein, as authorized by law; and

4.  For an order awarding Plaintiffs such additional relief as this court deems just and equitable.


Dated: November 23, 2013                         LAW OFFICES OF PETER H. BONIS




_____/s/_____

Peter H. Bonis

Case: 13-03174    Doc# 14    Filed: 11/25/13    Entered: 11/25/13 16:05:23    Page 58 of
58